IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JULIE BASZLER, Personal Representative of the Estate of AMANDA BAKER, Deceased, | ) ) ) ) | Case No. 7:15-cv-5000 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| COUNTY OF SCOTTS BLUFF, a Nebraska political subdivision; RON JOHNS, in his official and individual capacity; VERONICA CAMARILLO, in her official and individual capacity; MARK BOTZKI, in his official and individual capacity; and DOES 1 - 10, in their official and individual capacities, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Julie Baszler, Personal Representative of the Estate of Amanda Baker, Deceased, by and through her counsel of record, for her cause of action against Defendants, states as follows:

**PARTIES, JURISDICTION AND VENUE**

1.

Julie Baszler is the duly-appointed Personal Representative of the Estate of Amanda Baker, Deceased, and is a resident of Scotts Bluff County, Nebraska. She is also AMANDA's mother, and the grandmother of AMANDA's only child, David Baker II. Baszler was not a dependent of, nor was she supported by, AMANDA at the time of AMANDA's death.

2.

Defendant County of Scotts Bluff ("COUNTY") is a Nebraska political subdivision. Defendants JOHNS, CAMARILLO, BOTZKI and DOES are and/or were employed by COUNTY as correctional administrators and/or supervisors at all relevant times. All of these individual

COUNTY Defendants are liable for their actions in their individual and official capacities. All actions undertaken by any and all of the COUNTY Defendants constituted actions under color of state law.

3.

Defendants JOHNS and CAMARILLO were also policymakers and final decisionmakers for the Scotts Bluff County Department of Corrections at all relevant times, and were responsible for articulating, training, and ensuring compliance with official and unofficial policies for the protection of employees (including officers), inmates and any other person entering the secured areas of the Scotts Bluff County Detention Center.

4.

This action is brought pursuant to the provisions of 28 U.S.C. §§1331 and 1333 and 42 U.S.C. §1983. The proper venue for this action is the United States District Court for the District of Nebraska because the acts and omissions complained of herein occurred in Gering, Scotts Bluff County, Nebraska.

**<u>INTRODUCTION</u>**

5.

This case is about a county correctional department whose administrators who, in the interest of cutting the budget, gambled with the lives of those in the secure areas of the jail – officers, inmates, or approved visitors to the secure areas. Specific to this case, COUNTY, JOHNS and CAMARILLO withheld information from, and misrepresented information to, line officers, crippling line officers from protecting themselves.

6.

The effect of COUNTY, JOHNS and CAMARILLO's gamble was to allow persons in the

secure area of the jail to believe the jail was safer than it actually was. Relevant to this case, they withheld from the line officers the severe nature of the risks posed by particular inmates, their deliberate understaffing and undertraining, and their knowledge and acceptance of dangerously unsafe conditions. Had COUNTY, JOHNS and CAMARILLO honestly advised line officers of the severe nature of the risks posed by particular inmates, their deliberate understaffing and undertraining, and their knowledge and acceptance of dangerously unsafe conditions, those officers could have taken measures to protect themselves (including by not working at the Scotts Bluff County Detention Center).

7.

On the night of February 14, 2014, the administrators' gamble cost AMANDA, a correctional officer COUNTY employed on an "intermittent" basis, her life. An inmate strangled AMANDA, on video, with none of the few other employees on duty coming to her rescue.

8.

Since that time, COUNTY, JOHNS and CAMARILLO have ratified their decision to gamble with people's lives by refusing to change the dangerous conditions that led to AMANDA's murder. The risk to the lives of persons in the secure areas of the jail continues.

## FACTUAL BACKGROUND

9.

The Scotts Bluff County Detention Center, located in Gering, Nebraska, comprises an Adult Detention Center (the "adult side") and a Juvenile Detention Center (the "juvenile side). COUNTY advises the public, including prospective employment applicants viewing its web page, that it will

provide detainees, professionals and the public with a safe, secure and well managed facility.

COUNTY presents the Detention Center to the public as a good place to work, where the risks of violent inmates are controlled by sound management and appropriate support for line officers who must interact with the inmates.  By that marketing, COUNTY assumes a duty to persons who apply to work in the Detention Center to protect them from the dangers COUNTY creates by operating a facility that is neither safe, secure nor well-managed.

10.

COUNTY furthermore presents to the public that the job of an intermittent correctional officer requires no particular level of experience, training, or physical fitness, and can be performed by anyone with a high school diploma or the equivalent.  COUNTY describes the work to be performed as "providing security, safety and care to detainees, enforcing rules and regulations, maintaining order, escorting detainees, and supervising various detainee activities and programs."

11.

COUNTY intentionally misrepresented to prospective and current employees that the level of training it provides is adequate and appropriate to protect their safety.  For example, COUNTY represented to its new and intermittent employees, including AMANDA, that one short course at the outset of employment was adequate for an officer to protect him- or herself.  In fact, defensive tactics training should be repeated regularly rather than instructed just once at the outset of employment, in order for officers to internalize the training and practice the techniques taught. AMANDA, as an intermittent correctional officer working in her first correctional job, did not know this.  COUNTY also represented to its new and intermittent employees that there was no fundamental difference between working the "adult side" versus working the "juvenile side" of the Detention Center that would make it appropriate to train officers for working each side of the facility.

12.

COUNTY intentionally misrepresented to prospective and current employees that the level of staffing it provides is adequate and appropriate to protect their safety. For example, COUNTY represented that video cameras and monitors are an adequate and appropriate substitute for live staff. COUNTY further represented that employees tasked with watching the video cameras and monitors will observe, and respond to, safety threats to officers. AMANDA, as an intermittent correctional officer, trusted that officers assigned to watch the monitors for her safety would actually do so. COUNTY represented that one correctional officer and one supervisor, plus one officer ostensibly watching the video cameras and monitors remotely, was a safe level of staffing for an entire shift. AMANDA, as an intermittent correctional officer, worried that staffing on the floor was inadequate but had to trust that COUNTY, JOHNS and CAMARILLO knew what they were doing in providing just one other professional on the floor to assist and protect her.

13.

COUNTY also intentionally misrepresented that it would provide line officers with attentive and proactive supervisors who would take appropriate measures to protect the safety of their officers and take action to save their lives if necessary. AMANDA trusted that BOTZKI, the supervisor assigned to her shift on February 14, 2014, would be attentive and proactive and would take appropriate supervisory measures to protect her safety, or else COUNTY would not have assigned him to that role. AMANDA trusted that any supervisor assigned to any of her shifts would be willing and able to initiate rescue breathing and other lifesaving procedures if she needed the same; she was unaware that supervisors assigned to her shift lacked the training to perform rescue breathing or otherwise initiate emergent response if she were harmed.

14.

COUNTY intentionally misrepresented to prospective and current employees that the equipment it provides is adequate and appropriate to protect their safety.  For example, COUNTY represented that it will provide the proper equipment for officers to effectively communicate with each other.  In reality, officers would sometimes have only one working radio per shift, which makes no sense insofar as a second radio is needed for communications on the first radio to be heard.  Nor did COUNTY issue Tasers to officers, although some officers (including AMANDA) underwent initial Taser training.

15.

COUNTY intentionally misrepresented to prospective and current employees that the management of the jail, through adequate safety procedures, is such that any high school graduate (or GED recipient), with any level of physical fitness, can safely perform the duties of a correctional officer.  Though AMANDA was visibly overweight and smoked regularly, COUNTY did not caution her at the time of her job interview or thereafter that she lacked the level of physical fitness necessary to safely perform the duties of a correctional officer.  Because COUNTY hired AMANDA and intentionally misrepresented the Detention Center to be "safe, secure and well-managed," AMANDA trusted that COUNTY would not have hired her if her weight and fitness status impacted her ability to safely perform the duties of a correctional officer.

16.

COUNTY intentionally misrepresented to prospective and current employees that the detainees and inmates on the juvenile side of the facility were less of a risk to employees' safety, and that officers could and should serve in the role of a big brother or big sister rather than the role of a correctional authority figure.  COUNTY intentionally misrepresented to prospective and current employees that the security provisions on the juvenile side, including video monitoring, were the

same as the security provisions on the adult side.  And, COUNTY withheld from employees the nature of the safety risks posed by particular juvenile inmates.  AMANDA was unaware of these misrepresentations and withheld safety risk information, and was unable to take measures to protect herself as a result.

17.

The risk of each of these misrepresentations was obvious and known to COUNTY, JOHNS and CAMARILLO.  These risks were not obvious or known, however, to an intermittent line officer like AMANDA, whose schedule was erratic, who lacked information held by Defendants about particular violent inmates, and who lacked training that included honest advisement of the risks of working in COUNTY's detention facility.

18.

On information and belief, all Defendants were very aware, both from their own experience in corrections and from employee complaints, that their misrepresentation and withholding of evidence presented a substantial risk of serious harm, specifically (though not exclusively) to include the risk that a particular inmate, Dylan Cardeilhac, would harm line officers while detained in the facility.

**FEBRUARY 14, 2014**

19.

On the night of February 14, 2014, COUNTY had assigned BOTZKI to supervise AMANDA on the juvenile side of the Detention Center, on third shift.  COUNTY did not provide any other officers to work the floor for the juvenile side for that shift.

20.

COUNTY provided one radio for the juvenile side of the Detention Center that night; the

radio remained with BOTZKI in the supervisors' office.

21.

Among the inmates and detainees housed on the juvenile side of the Detention Center was Dylan Cardeilhac.  Cardeilhac, then 15 years old, was awaiting trial on charges of armed robbery and use of a firearm to commit a felony.  Defendants did not make AMANDA aware of the nature of Cardeilhac's charges, or whether he was in the juvenile side of the Detention Center based on violent criminal conduct versus a non-violent status offense.

22.

In the days leading up to February 14, 2014, inmate Dylan Cardeilhac had asked DOE #1, a correctional officer, for information on how to strangle an unnamed person.  DOE #1 answered Cardeilhac's questions.  Unconscionably and with zero rational justification, DOE #1 withheld from AMANDA the fact that Cardeilhac was seeking information on how to murder someone.  AMANDA was unaware that Cardeilhac was seeking information on how to assault and/or murder someone.

23.

At some point before AMANDA reported for duty on the night of February 14, 2014, Cardeilhac was placed in a cell by himself in order to segregate him from other juvenile inmates due to violent misconduct.  COUNTY, BOTZKI and DOES withheld from AMANDA the reason Cardeilhac had been segregated from other juvenile inmates.

24.

Cardeilhac used the intercom in his cell to ask AMANDA and BOTZKI to come to his cell to help him.  Although it was unclear what kind of help Cardeilhac was requesting or whether he was asking for the kind of help that one officer could provide on her own, BOTZKI directed

AMANDA to go to Cardeilhac's cell by herself.

25.

Cardeilhac's request for help was a ruse, designed to lure AMANDA into his cell.  When AMANDA entered his cell, Cardeilhac asked AMANDA to look at something allegedly on the floor of his cell.  When AMANDA crouched down to look at the alleged item of Cardeilhac's concern, Cardeilac began to strangle AMANDA with his hands and arms.

26.

Cardeilhac strangled AMANDA for about 90 seconds, with no interruption from BOTZKI or any other officer or supervisor.  He strangled AMANDA for long enough to cause brain death, and hemorrhages in her eyes, tongue and neck.  Cardeilhac then removed AMANDA's keyring from her duty belt and left his cell, hoping to escape from the Detention Center.

27.

There was a video camera in Cardeilhac's cell, enabling observation and viewing by any officer or supervisor with access to a monitor.  DOE #2, the officer in "the tower" assigned to view video monitors, paid zero attention to the monitor for Cardeilhac's cell.  On information and belief, the monitor was also visible to BOTZKI had he wanted to watch AMANDA for her safety, which he did not.

28.

BOTZKI knew that responding to Cardeilhac's request for help would involve entering a locked cell occupied by an inmate who had been segregated from other inmates and who was facing serious violent felony charges.  Armed with that knowledge, BOTZKI sent AMANDA to respond, alone.

29.

Eventually BOTZKI decided to take a walk around the juvenile side of the Detention Center. When he reached Cardeilhac's cell, he saw AMANDA's body, nearly but not quite lifeless. Instead of calling 911, initiating rescue breathing and calling for emergency assistance (including assistance from officers on the adult side of the jail), he left AMANDA laying on the cell floor while he walked down the hall to see where Cardeilhac was. Nor did DOE #2 summon emergency assistance for AMANDA.

30.

DOES and BOTZKI delayed calling 911 to summon emergency medical transport for AMANDA. By the time EMTs finally arrived at the Detention Center, AMANDA had been unconscious for over 15 minutes.

31.

EMTs transported AMANDA to the hospital, where it was determined that she was no longer medically salvageable. AMANDA lived on life support for two days so that arrangements could be made to harvest and donate her organs. She died on February 16, 2014, at the age of 24.

32.

The Scotts Bluff County Sheriff's Office and the Nebraska State Patrol investigated the criminal acts by Cardeilhac and an accomplice, Guy Eagle Elk, in a manner that was appropriate for a homicide investigation. Separate and apart from the homicide investigation, however, was COUNTY's investigation regarding the degree to which it withheld important information that AMANDA needed in order to protect herself. That investigation was conducted by COUNTY, JOHNS and CAMARILLO; and it was so self-serving and so inadequate as to constitute a ratification of the dangerous decisions COUNTY, JOHNS and CAMARILLO had already made to operate the Detention Center in a manner that was anything but "safe, secure and well-managed."

33.

COUNTY, JOHNS and CAMARILLO have continued representing to the public – to this day – that its facility is "safe, secure and well-managed," despite that they have made no lasting changes to correct either the conditions that led to AMANDA's murder or their own representations about those conditions.

34.

COUNTY has completely refused good-faith efforts by AMANDA's representatives to engage COUNTY in a meaningful discussion about how to improve safety at the Detention Center. AMANDA's representatives even offered to give COUNTY a full release of tort liability if COUNTY would give a jail safety consultant full access to audit its safety procedures and then conduct a public vote on any recommendations such a consultant might offer.  COUNTY refused that offer, in ratification of the derelictions on the part of Defendants that were a proximate cause of AMANDA's death.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

### STATE-CREATED DANGER/INTENTIONAL MISREPRESENTATION

35.

AMANDA had a right under the Constitution of the United States to be free from state-created dangers, as well as a right to due process and equal protection, by employees of governmental entities.  She was a member of the group of professionals whom COUNTY induced to apply for and work as correctional officers by intentionally misrepresenting that it would "provide detainees, professionals and the public with a safe, secure and well managed facility."

36.

Had Defendants communicated honest information about the risks created by their management practices instead of misrepresenting the Detention Center as a "safe, secure and well managed facility," employees would have refused to work at the Detention Center under the conditions Defendants created; had Defendants communicated honest information about the known risks presented by Dylan Cardeilhac in particular, line officers, including AMANDA, would have refused to enter his cell alone. Defendants' conduct in intentionally misrepresenting and concealing the dangers created by their management of the Detention Center as set forth above put AMANDA at a significant risk of serious, immediate and proximate harm.

37.

The risk Defendants created was obvious and was known to Defendants. Defendants had knowledge of assaults on correctional staff and escape attempts (including from the juvenile side of the Detention Center). Yet Defendants refused to make lasting changes to improve the safety and security of the Detention Center; and, Defendants continued to induce persons such as AMANDA to work at the Detention Center by representing it as a "safe, secure and well managed facility."

38.

The risk Defendants created by misrepresenting Cardeilhac's dangerous nature in particular was obvious and known to Defendants. AMANDA, an intermittent officer who mostly worked the adult side of the Detention Center, lacked information about Cardeilhac's dangerous nature because Defendants withheld it from her. This includes, but is not limited to, the information that, within the days before he strangled AMANDA, Cardeilhac had sought information from DOE #1 about how to strangle a person, with DOE #1 withholding that information from AMANDA so that she could not protect herself; it also includes withholding from AMANDA the reason for segregating Cardeilhac from other inmates on the night of February 14, 2014.

39.

By intentionally misrepresenting the risks created by their decisions, Defendants acted recklessly in conscious disregard to those risks. Defendants' intentional misrepresentation to AMANDA and other correctional officers of the risks in working at the Detention Center shocks the conscience, including but not limited to these particulars:

a.   Withholding of information from AMANDA that Cardeilhac had sought information about how to strangle a person, as well as information regarding the reason for Cardeilhac's segregation from other inmates and his violent nature;

b.   Withholding of information from AMANDA that officers were routinely allowed to ignore video monitors whose very purpose was to protect the safety of persons in the secure areas of the jail (even if their actual job assignment was to observe video monitors);

c.   Withholding of information from AMANDA that her supervisors were permitted to ignore obvious risks to the safety of officers under their supervision;

d.   Withholding of information from AMANDA that her supervisors were untrained in emergency rescue procedures; and

e.   Withholding of information from AMANDA that the risk of assaultive inmates is such that correctional officers need regular and dynamic training in defensive tactics and good physical fitness to be able to survive a disturbance or assault.

40.

At all times relevant to this Complaint, Defendants were acting under color of law – under the constitutions, statutes, administrative rules, customs, policies and usages of COUNTY, the State of Nebraska and the United States – and had assumed the responsibilities, activities, and rights involved in exercising their roles as members of COUNTY's professional staff.

41.

When AMANDA was working for COUNTY, Defendants acted with deliberate indifference

to AMANDA's known and recognized constitutional and legal rights to due process, equal protection and bodily integrity and to be free from harm caused by state-created danger. Defendants actively participated in the deprivation of AMANDA's constitutional rights: while it was Cardeilhac who strangled AMANDA, Defendants enabled Cardeilhac to strangle AMANDA by intentionally withholding information that AMANDA would have used to protect herself.

42.

Defendants' conduct, within their duties as a member of COUNTY's professional staff, under color of state law, deprived AMANDA of rights, privileges and immunities secured by the United States Constitution. Particularly, AMANDA was deprived of her constitutional liberty interest in due process, equal protection and bodily integrity. AMANDA suffered terror, physical and mental pain and death needlessly because of Defendants' deliberate indifference.

43.

As a result of Defendants' deprivation of AMANDA's constitutional liberty interests described above, The Estate has incurred damages.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

### POLICY OR CUSTOM OF WITHHOLDING INFORMATION FROM PROSPECTIVE AND CURRENT EMPLOYEES

44.

COUNTY had a special relationship with AMANDA, by virtue of the fact that COUNTY made false representations to induce people such as AMANDA to apply for employment at the Detention Center. AMANDA could not know that COUNTY would hire her for a job she was unfit to perform, would undertrain her, and would continue to misrepresent risks to her safety throughout

her employment.

45.

COUNTY knew this, and further knew that each had a duty to exercise reasonable care in management of inmates and in the selection, training, assignment, supervision and retention of its professional staff.  This includes a policy of providing prospective professional staff with accurate information about, for example:

* The incidence of inmate assault and escape attempts at the facility;

* The physical demands of the position of correctional officer;

* The limited training COUNTY would be providing correctional officers in defensive tactics and rescue procedures;

* The adequacy (and lack thereof) of staffing to safely perform all of the necessary duties during a shift; and

* Important information regarding particular inmates' violent tendencies and expressions of intent to harm.

AMANDA could not have reasonably discovered that COUNTY had a custom or practice of withholding critical safety information that officers need to protect themselves, because such knowledge was specifically held by administrators and officers of COUNTY, including the individual Defendants.

46.

JOHNS and CAMARILLO had a non-delegable duty to create customs, policies, practices and procedures to protect the safety of officers, inmates and other persons entering or working in secure areas of the jail, to include policies of full and accurate disclosure to current and prospective officers of the risks then and there existing at the Detention Center, including risks presented by particular inmates, so that those officers could make the necessary decisions for their protection.

47.

BOTZKI had a non-delegable duty to disclose known risks to correctional officers under his supervision regarding particular inmates' violent tendencies and expressions of intent to harm. DOE #1 had a non-delegable duty to disclose to officers and supervisors the known risks involved with an inmate asking him for information on how to strangle a person.

48.

Yet each of these Defendants withheld from AMANDA the information they had a duty to disclose – in her hiring, in her continued employment as an intermittent correctional officer, and on the night of February 14, 2014. That withholding of information was part of a widespread pattern and unofficial policy of withholding from prospective and current employees, and the public at large, important information regarding the management of the Detention Center and acuity of the safety dangers there, including safety dangers presented by particular inmates.

49.

By that unofficial policy of withholding critical safety information, COUNTY, JOHNS, CAMARILLO, BOTZKI and DOES acted with deliberate indifference to a known risk of state-created danger to AMANDA. As a result, AMANDA suffered terror, physical and mental pain and suffering and death needlessly.

50.

As a result of COUNTY's deliberate indifference to the risk of deprivation of AMANDA's constitutional liberty interests, the Estate incurred damages as set forth below.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – RATIFICATION

51.

JOHNS and CAMARILLO were policymakers and final decisionmakers for the Scotts Bluff County Corrections Department.

52.

In that capacity, JOHNS, CAMARILLO and COUNTY conducted and approved an investigation into AMANDA's death that was so inadequate as to constitute a ratification of the state-created danger that resulted in AMANDA's murder. JOHNS, CAMARILLO and COUNTY rejected all efforts by Plaintiff to enter into good-faith settlement discussions that would have included proposals for substantive changes to staffing, training and communication policies for the protection of life and limb in the Detention Center; the reason for rejecting those efforts was not financial (as Plaintiff had offered to accept a minimal worker's compensation-value economic recovery), but because Defendants did not want to change their ways.

53.

In fact, COUNTY's and JOHNS' persistence in maintaining a policy and custom of withholding information from line officers resulted, in February 2015, in *another* strangulation of a line officer by a violent inmate. On information and belief, Defendants still persist in maintaining those critically dangerous policies and customs to this day.

**PUNITIVE DAMAGES**

54.

Plaintiff incorporates by reference the allegations contained in paragraph 1-55 above as though fully set fourth herein.

55.

In addition to compensatory damages, Plaintiff hereby makes a claim for punitive damages against defendants in an amount to be proven at trial for the willful and wanton acts and omissions

of Defendants, to include violation of AMANDA's civil rights, as alleged herein.  The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others, including AMANDA.  Defendants committed the acts and omissions alleged herein and subjected AMANDA to conscience-shocking state-created danger that caused AMANDA to suffer physical, psychological and psychiatric pain so severe that no person should be expected to endure it in the course of her strangulation, and ultimately that caused her death.  Defendants' actions should be punished, and an example should be made so that these actions and omissions are not repeated.

56.

This instance of reckless and callous indifference to AMANDA's constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that will not be tolerated.

## ATTORNEY'S FEES

57.

As a result of Defendants' actions as alleged herein, Plaintiff has been required to retain the services of attorneys and are entitled to a reasonable amount for attorney's fee pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

## DAMAGES

58.

The acts and omissions of Defendants as set forth above have resulted in AMANDA's terror, pain, suffering and death.  Plaintiff thus seeks recovery for the following damages:

A.  General compensatory damages in an amount to be proven at trial, for AMANDA's terror and conscious physical and mental pain and suffering during her strangulation;

B.  All general compensatory damages for AMANDA's wrongful death including the loss of AMANDA's care, comfort, consortium and companionship;

C.  General compensatory damages for the  violation of AMANDA's rights under the federal and state Constitutions;

D.  Punitive damages to punish and deter the reprehensible conduct alleged in this Complaint;

E.  Attorney's fees; and

F.  The costs of this action and such other and further relief as this Court deems equitable and proper.

**WHEREFORE,** Plaintiff prays for judgment against the defendants as follows:

A.  Plaintiff prays for damages in an amount which will fairly and justly compensate for AMANDA's physical and emotional injuries and the violation of AMANDA's civil rights, her pain and suffering, losses occasioned by AMANDA's comfort, care and companionship, and other consequential damages flowing from the violations and torts set forth herein;

B.  Punitive damages in an amount sufficient to adequately punish defendants and to deter future conduct of the type alleged in this Complaint;

C.  For attorney's fees pursuant to 42 U.S.C. § 1988; and

D.  For the costs of this action and for such other and further relief as this Court deems equitable and proper.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff requests that this matter be tried to a jury in North Platte, Nebraska.

JULIE BASZLER, Personal Representative of the Estate of AMANDA BAKER, Deceased, Plaintiff,

By:_____/s/ *Maren Lynn Chaloupka*_____
            Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Holyoke Snyder Chaloupka Longoria & Kishiyama, P.C., L.L.O.
1714 2nd Avenue
P.O. Box 2424
Scottsbluff, NE  69363-2424
Telephone:  (308) 635-5000
Facsimile: (308) 635-8000
mlc@chhsclaw.net